IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | | |
| Plaintiff, | | No.  4:20-cr-118-JAJ |
| vs. | | |
| MARLIN SANTANA THOMAS, | | **ORDER** |
| Defendant. | | |

This case comes before the Court pursuant to defendant's October 5, 2020 Motion to Dismiss [Dkt. 30]. The government filed its resistance on November 16, 2020 [Dkt. 37]. On November 30, 2020, defendant filed his reply [Dkt. 42], and a Motion for Hearing [Dkt. 43]. On December 7, 2020, the Court granted Thomas's motion for a hearing, and held an evidentiary hearing on January 7, 2021. [Dkt. 45].  On January 8, 2021, the government moved to dismiss Counts 13 and 15 of the superseding indictment. [Dkt. 50]. The Court granted that motion. [Dkt. 51]. Thomas's motion remains pending as to all other counts.

For the following reasons, the Motion to Dismiss is **GRANTED** as to Count 14, and **DENIED** as to Counts 1 through 12, 16, and 17.


BACKGROUND

The parties agree that the indictment is based on the following factual allegations. Thomas does not concede any of these are true, and they remain mere allegations. The Court will first briefly explain the crimes that Thomas allegedly committed, before describing how law enforcement and state and federal prosecutors learned of the offenses.


**1.     Sex trafficking activity**

This case arises from Thomas's alleged trafficking of several women, and one minor. The Government alleges that, from at least as early as September 2009, and continuing until March 2011, Thomas trafficked women, including Victims 1, 2, 4, and 5, for the purpose of prostitution.

[Dkt. 9].[1] For some of these women, including Victims 2 and 5, Thomas drove them across state lines to prostitute them. [*Id.*].  He trafficked Victim 6 from about November 2014 until March 2015, and Victims 3 and 7 from 2017 until he was arrested February 28, 2018.  [*Id.*]. The allegations related to Minor Victim A arise from a few days in February 2017, while she was a runaway.

Victim 1 met Thomas in late 2008 or early 2009 when he paid to have sex with her. [Def. Ex. Q, Dkt. 30-18]. Although he helped her escape from her previous pimp, he soon began trafficking her. [*Id.*]. Thomas took Victim 1 to Chicago on two occasions, and to Minnesota and North Dakota. [*Id.*].

Victim 2 met Thomas in December 2009 or early 2010. She became pregnant by Thomas in early 2010. [Def. Ex. P, Dkt. 30-17]. While she was pregnant, he physically abused her and forced her to be a prostitute. [*Id.*]. Thomas would take Victim 2's young son from her to force her to cooperate. [*Id.*]. Like Victim 1, Thomas traveled with Victim 2 to other states to prostitute her, and on at least one trip, he transported both Victims 1 and 2. [*Id.*].

Victim 4 met Thomas in about May 2010. [Def. Ex. A, Dkt. 30-2]. Although she believed they were in a relationship, by July 2010, he was prostituting her and put her on Backpage. [*Id.*]. She stopped seeing Thomas regularly after she was arrested in September 2010. [*Id.*]. In 2013, Thomas began contacting her again. He would stand outside the facility where she lived and would send her text messages. [*Id.*]. On May 9, 2013, Victim 4 agreed to meet with Thomas. [*Id.*]. Thomas took her to a house and forcibly raped her. [*Id.*]. Victim 4 reported the assault to the Des Moines Police Department ("DMPD"), but no further action was taken against Thomas at that time. [*Id.*].

Victim 5 met Thomas in approximately 2010. [Def. Ex. R, Dkt. 30-19]. Thomas created Backpage ads of Victim 5 and used them to find men willing to pay for sex with her. [*Id.*]. Victim 5 frequently traveled with Thomas, both within Iowa and to other states. [*Id.*]. They took multiple trips, including to Chicago, Kansas City, St. Louis, and Tennessee. [*Id.*].

Victim 6 began to have regular contact with Thomas in approximately September or October 2014. [Def. Ex. S, Dkt. 30-20]. Thomas used photos of other women to make Backpage

---

[1] Unless otherwise indicated, citations to the docket are citations to the docket in the present case, 4:20-cr-118-JAJ (S.D. Iowa). Citation to the dockets of other cases are indicated by reference to the appropriate case number.

ads for her. [*Id.*]. Victim 6 sometimes refused to have sex with the men Thomas arranged for her, but when she did this, Thomas raped her. [*Id.*].

Minor Victim A was trafficked by Thomas in February 2017. [Def. Ex. C, Dkt. 30-4]. On February 6, 2017. Minor Victim A ran away from her foster home. [*Id.*]. She slept outside that night, and the next morning she was approached by Thomas, who offered her a place to stay. [*Id.*]. Minor Victim A asked Thomas if he had any marijuana, but Thomas instead offered her some methamphetamine, which she smoked. [*Id.*]. Thomas took her to his house, and she fell asleep there. [*Id.*]. The next morning, Minor Victim A again asked for marijuana, but Thomas gave her heroin instead. [*Id.*]. Later that day, Thomas drove Minor Victim A to Walgreens. [*Id.*]. At Walgreens, staff caught her stealing makeup. [*Id.*]. Although Thomas ultimately paid for the makeup, he was angry, and slapped her. [*Id.*]. Thomas then took her to multiple hotels where men paid him to have sex with Minor Victim A. [*Id.*]. Thomas himself had sex with her at least once and attempted to have anal sex with her. [*Id.*]. Eventually, Minor Victim A left the hotel and went to Walmart. [*Id.*]. There, she called a friend and told him where she was. [*Id.*]. Her friend informed the police, and the police recovered her. [*Id.*]. On May 22, 2017 Thomas was charged in Iowa state court with human trafficking for the trafficking of Minor Victim A. [Gov. Ex. 2, Dkt. 36-2]. When he was arrested, DMPD seized, and subsequently searched pursuant to a warrant, Thomas's Samsung Galaxy S8+. [Def. Ex. D, Dkt. 30-5].

Victim 7 began interacting with Thomas in August 2017 because she was using heroin. [Def. Ex. T, Dkt. 30-21]. Thomas raped Victim 7 and forced her to have sex with other men. [*Id.*]. Thomas used Backpage to create ads for her and would control all the communication between Victim 7 and the men. [*Id.*]. Thomas used Victim 7's addiction to force her to cooperate. [*Id.*]. He would refuse to give Victim 7 heroin until she experienced withdrawal symptoms severe enough that she was willing to have sex with him in exchange for it. [*Id.*].

Victim 3 was introduced to Thomas by a mutual friend. [Def. Ex. H, Dkt. 30-9]. She began to purchase heroin from him. [*Id.*]. At one point, because she had been clean for a while, Victim 3 refused some heroin that Thomas offered to her. [*Id.*]. Angry at her refusal, Thomas choked her and forced the heroin into her mouth. [*Id.*]. She believes he wanted her to relapse because she was easier for him to control when she was addicted. [*Id.*]. By September 2017, Victim 3 was purchasing heroin from Thomas every day. [*Id.*]. When she did not have enough money, Victim 3 would have sex with Thomas in exchange for heroin. [*Id.*].

2.      **2018 Heroin Charges**

Thomas first came to the attention of federal prosecutors in early 2018. Between January and February 2018, DMPD Officer Todd Wilshusen received information from a confidential informant that Thomas was involved in trafficking heroin in the Des Moines area. [Gov. Ex. 4, Dkt. 36-4, at ¶ 12]. During his investigation, Wilshusen learned that Thomas was on pre-trial release for state human trafficking charges—the charges based on the trafficking of Minor Victim A. [*Id.* at ¶ 30].[2] By February 2018, Wilshusen had informed the U.S. Attorney's Office that he was pursuing a heroin suspect with pending state human trafficking charges. [Gov. Br., Dkt. 36 at 4–5].

Wilshusen used the confidential informant to make three controlled buys of heroin from Thomas—one on February 6, one on February 9, and one on February 19. [Gov. Ex. 4, Dkt. 36-4, at ¶¶ 15–20]. Based on the first two controlled buys, DMPD obtained a federal tracking warrant for Thomas's car. [Def. Ex. E, Dkt. 30-6]. With the information from the buys and the tracking warrant, on February 28, 2018, Wilshusen obtained a federal criminal complaint and an arrest warrant for Thomas. [*United States v. Thomas*, 4:18-mj-130-CFB (S.D. Iowa), Dkt. 2, 3]. He also obtained federal search warrants for Thomas's apartment and car. [Def. Ex. F, Dkt. 30-7].

On February 28, 2020, DMPD executed the search warrant on Thomas's apartment. In the apartment, officers found approximately ½ gram of heroin, suspected drug packaging, three digital scales, and two cellphones—a Samsung J1 and a Samsung Galaxy Note 8. [Def. Ex. G, Dkt. 30-8]. DMPD obtained federal search warrants for the phones on March 9, 2018. [Def. Ex. I, Dkt. 30-10]. That warrant permitted law enforcement to search the phones for information related to Title 21 controlled substances offenses. [*Id.* at 6].

Also present at the apartment were Thomas and Victim 3. [Def. Ex. G, Dkt. 30-8]. Wilshusen arrested Thomas and interviewed Victim 3. [*Id.*]. Victim 3 told Wilshusen that she had met Thomas approximately two years before, she had begun buying heroin from him about 3-4 months ago, she bought approximately $100 of heroin from Thomas each day, and she had previously had sex with Thomas in exchange for heroin. [*Id.*]. Wilshusen interviewed her again on March 8, 2018, at the U.S. Attorney's Office. [Def. Ex. H, Dkt. 30-9]. In that interview, Victim 3

---

[2] Wilshusen described Thomas as being on "pre-trial release." Thomas had been released on bond. [Gov. Ex. 3, Dkt. 36-3].

described her relationship with Thomas. She explained that she would exchange sex for heroin when she did not have the money to purchase it. [*Id.*].

On March 13, 2018, Thomas appeared for a combined preliminary and detention hearing. [Def. Ex. J, Dkt. 30-11]. The government was represented in this hearing by AUSA Amy Jennings, and Thomas was represented by AFPD Timothy Ross-Boon. [*Id.* at 1]. The government argued that Thomas's criminal history was a reason for him to be detained. [*Id.* at 7]. In particular, the government argued that the most concerning incident in his criminal history was the pending state court charge for trafficking Minor Victim A. [*Id.* at 7–8]. The government noted that Thomas was "alleged to have provided food, shelter, narcotics, and makeup to the minor victim. He[ was] alleged to have arranged for three different males to meet with and have sex with the minor victim in exchange for money, and that the defendant collected that money." [*Id.*]. The court found these allegations "[o]f significant concern" and ordered that Thomas be detained pre-trial. [*United States v. Thomas*, 4:18-cr-051-JAJ (S.D. Iowa), Dkt. 18, at 4].

On March 19, 2018, Jennings submitted a prosecution memo and proposed indictment to her supervisors. [Def. Ex. AB, Dkt. 47]. A prosecution memo is a tool used by an AUSA to explain the background of a case. The memo often includes more information than is necessary for an indictment. [Hrg. Trans., Dkt. 52, at 79–80]. Jennings's memo described the three controlled buys conducted by Wilshusen and the search of Thomas's apartment. [Def. Ex. AB, Dkt. 47, at 1–2]. The memo also addressed potential human trafficking charges. It described the pending state charges and identified Minor Victim A and Victim 3 as possible victims of trafficking. [*Id.*]. Jennings stated that she and AUSA Virginia Bruner "intend to try to bring federal the pending state trafficking charge involving [Minor Victim A] and/or develop a new trafficking case against THOMAS based on more recent conduct." [*Id.* at 2].

While the drug case was progressing, the U.S. Attorney's Office also took steps related to sex trafficking. On February 9, 2020 Bruner served a subpoena related to Thomas on Backpage's custodian of records. [Def. Ex. V, Dkt. 42-1]. Bruner submitted a second subpoena on March 9, 2018. [Def. Ex. W, Dkt. 42-2]. The second subpoena requested records related to a phone number associated with Thomas. [*Compare id.* (requesting records for phone number ending in 4721) *with* Gov. Ex. 1, Dkt. 36-1 at ¶ 42 (reporting that during the drug investigation, a confidential source and a DMPD officer used that phone number to contact Thomas)]. Backpage responded with records of several ads by an account using that number. [Gov. Ex. 1, Dkt. 36-1 at ¶ 42]. The account

was associated with several other numbers and an email address. [*Id.*]. Bruner followed up on March 23, 2018 with a subpoena requesting all records involving those additional phone numbers and email address. [*Id.*; Def. Ex. X, Dkt. 42-3]. Based on Backpage's response to the third subpoena, the government believed that Thomas posted ads on Backpage during the time Minor Victim A reported that he had posted an ad of her. [Gov. Ex. 1, Dkt. 36-1 at ¶ 42].

On March 27, 2018, Minor Victim A and Victim 3 testified before the grand jury. [Def. Ex. Y, Dkt. 42-4 (Minor Victim A); Def. Ex. Z, Dkt. 42-5 (Victim 3)]. AUSA Jennings examined both witnesses. The government did not provide Thomas's attorney, AFPD Melanie Keiper, transcripts of this testimony as part of discovery. [Gov. Br., Dkt. 36 at 36]. The transcripts were filed as sentencing exhibits shortly before Thomas's sentencing. [*Id.*; *see also United States v. Thomas*, 4:18-cr-051-JAJ (S.D. Iowa), Dkt. 57].

Minor Victim A testified about the events of February 2017, when Thomas trafficked her. [Def. Ex. Y, Dkt. 42-4]. She testified about the drugs Thomas gave her [*id.* at 7, 9], how Thomas posted ads of her on Backpage [*id.* at 10–11], and about how he arranged for men to pay to have sex with her [*id.* at 12–14, 21–29]. Minor Victim A also described how, while he was driving her around, Thomas's car broke down. [*Id.* at 18]. Thomas called a woman, known to Minor Victim A as "Puder," to pick them up. [*Id.*].  Jennings called Minor Victim A to testify before the grand jury to "lock in" her testimony, in case the government needed to use it in a future human trafficking case. [Hrg. Trans., Dkt. 52 at 81–82].

Victim 3 testified about her relationship with Thomas. [Def. Ex. Z, Dkt. 42-5]. She testified about her drug addiction, including the fact that she would have sex with him in exchange for heroin, and the one time he forced her to use heroin. [*Id.* at 7, 13–17]. She also testified about one incident where Thomas put her on Backpage, and someone paid to have sex with her. [*Id.* at 10–11]. Victim 3 stated that "Puder" was a nickname that Thomas used for her. [*Id.* at 8] and that she was the one who picked up Minor Victim A when Thomas's car broke down. [*Id.* at 21–23]. Victim 3 identified B.B. as another woman who Thomas would talk about frequently. [*Id.* at 8].

The same day that Minor Victim A and Victim 3 testified, March 27, 2018, the grand jury issued a five-count indictment against Thomas. [*United States v. Thomas*, 4:18-cr-051-JAJ (S.D. Iowa), Dkt. 23]. Thomas was charged with conspiracy to distribute heroin, distribution of heroin, and possession with intent to distribute heroin, all in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C). [*Id.*]. Although Minor Victim A was 15 years old at the time of her grand jury testimony

[Def. Ex. Y, Dkt. 42-4, at 3], and Victim 3 was 21 [Def. Ex. Z, Dkt. 42-5, at 3], Thomas was not charged with distributing a controlled substance to a person under the age of 21. Nor was he charged with any federal sex trafficking offenses.

On April 10, 2018, DMPD Officer Michael Westlake obtained a state warrant for the Samsung J1 seized during the search of Thomas's apartment. [Def. Ex. K, Dkt. 30-12]. In support of probable cause, Westlake noted that Thomas had been charged with trafficking Minor Victim A. [*Id.* at 6]. He also reported that Wilshusen had searched the phone for evidence of drug trafficking, pursuant to the federal search warrant. [*Id.*]. During Wilshusen's review, he "discovered evidence of human trafficking and prostitution including outgoing and incoming text messages detailing multiple instances of human trafficking and prostitution." [*Id.*].

### 3.    2018 Plea Negotiations

The United States Attorney's Office considered charging Thomas in federal court with the trafficking of Minor Victim A. [Hrg. Trans., Dkt. 52 at 54]. However, by April 27, 2018, AUSAs Bruner and Jennings had decided not to bring these charges and informed the Polk County Attorney of their decision. [*Id.*; *see* Gov. Ex. 12, Dkt. 48-2]. Jennings also told AFPD Keiper on May 4, 2018. [Def. Ex. AI, Dkt. 47-3; *see* Hrg. Trans., Dkt. 52 at 9–10]. Although this was not a promise made by the government, Keiper believed that the best outcome for her client was for him to quickly plead guilty so that the government did not seek to bring these charges as part of a trial. [Hrg. Trans., Dkt. 52 at 13, 28].

Because she believed a guilty plea was the best option, Keiper sent an email to Jennings, requesting a plea agreement. [Gov. Ex. 13, at 3]. Specifically, she requested an agreement under which Thomas would plead guilty to Count 1, the conspiracy to distribute heroin charge. [*Id.*]. This is a standard procedure for drug cases in this district. [Hrg. Trans., Dkt. 52 at 63–64]. Drug cases are often charged with a conspiracy count, plus any appropriate distribution or possession counts. [*Id.*]. Of the charges, the conspiracy count is the most serious offense. [*Id.*]. Because the U.S. Attorney's Office has a policy that requires defendants to plead to the most serious count, drug cases are frequently resolved by a plea to one count of conspiracy, and the dismissal of all other charges. [*Id.*].

Jennings responded to Keiper with a draft agreement on May 11, 2018. [Gov. Ex. 13, at 5]. Under this agreement, Thomas would plead guilty to Count One of the indictment, and the other

charges would be dismissed. [*Id.*]. Later that same day, Keiper responded and requested three changes. [*Id.* at 6]. The first change related to the factual basis for the plea, the second change related to drug quantity and Thomas's base offense level under the Sentencing Guidelines, and the third related to Thomas's prior drug conviction. [*Id.*]. Although Jennings was willing to make the first two changes, she did not make the third change because that clause to was standard language for plea agreements. [*Id.*]. The parties did not specifically negotiate any other term in the plea agreement. [Hrg. Trans., Dkt. 52 at 52].

Thomas signed the final plea agreement on May 14, 2018. [Def. Ex. U. at 9 [hereinafter "Plea Agreement"]]. He plead guilty on May 21, 2018. [*United States v. Thomas*, 4:18-cr-051-JAJ (S.D. Iowa), Dkt. 37]. He plead guilty to Count One, conspiracy to distribute heroin, in exchange for the government dismissing Counts Two through Five. [*Id.* ¶¶ 1–2]. Paragraph 3 of the Plea Agreement reads:

> No Further Prosecution. The Government agrees that Defendant will not be charged in the Southern District of Iowa with any other federal criminal offense arising from or directly relating to this investigation. This paragraph and this Plea Agreement do not apply to (1) any criminal act occurring after the date of this agreement, (2) any crime of violence, or (3) any criminal offense which Defendant did not fully disclose to law enforcement during Defendant's interviews pursuant to any proffer or other agreements with the United States.

[Plea Agreement ¶ 3].

## 4. Post-plea Developments

On May 17, 2018, DMPD Officers Fong and Noble interviewed B.B. [Def. Ex. L., Dkt. 30-13]. Victim 3 had named B.B. as someone associated with Thomas when Wilshusen interviewed her on March 8, 2018. [Def. Ex. H, Dkt. 30-9]. B.B. stated that she knew Thomas, and Thomas's ex-girlfriend, K.T. [*Id.*]. B.B. described doing heroin with K.T. and driving K.T. around to perform acts of prostitution. [*Id.*]. Although she denied ever engaging in prostitution or being trafficked by Thomas, B.B. stated that Thomas had raped her when she was approximately 16 years old. [*Id.*].

On June 20, 2018, DMPD Officer Fong and AUSA Bruner conducted a proffer interview with K.T. [Def. Ex. M, Dkt. 30-14]. K.T. was interviewed because Bruner believed that K.T. had information relevant to a sex trafficking case against Darren Coleman and Mark Carter. [Gov. Br., Dkt. 36 at 9; *see also United States v. Coleman*, 4:18-cr-053-JAJ (S.D. Iowa)]. K.T. told police

about one weekend when she had worked as a prostitute for Thomas. [Def. Ex. M, Dkt. 30-14]. K.T. and Thomas separately prepared Backpage ads for K.T., and each received some responses. [*Id.*]. Thomas ended up with all the money K.T. earned, either because she had to pay him half when someone called his ad, or because she gave it to him in exchange for heroin. [*Id.*]. K.T. died in December 2019. [Gov. Br., Dkt. 36 at 10; Gov. Ex. 7, Dkt. 36-7]. Thomas is not charged with any offenses related to her.

### 5.     2018 Sentencing

The Court sentenced Thomas on October 23, 2018. [Def. Ex. N, Dkt. 30-15].[3] The government filed the transcripts of Minor Victim A's and Victim 3's grand jury testimony as sentencing exhibits. [*Id.* at 4]. Additionally, the government called Officer Fong to testify regarding the information received in K.T.'s proffer interview. [*Id.* at 7]. Fong testified that he interviewed K.T. as part of an unrelated sex trafficking case that he was investigating. [*Id.*]. On cross-examination, he testified that he did not investigate the Thomas case. [*Id.* at 12]. Based on the evidence of Minor Victim A, Victim 3, and K.T., the government argued that Thomas "inextricably intertwined heroin distribution with sex with females, coercive sex with females, and using heroin to further prostitution of adult females as well as minor females." [*Id.* at 27].

The Court found that an enhancement for use of violence, pursuant to U.S.S.G. § 2D1.1(b)(2), was appropriate in heroin case. [*Id.* at 22]. Specifically, the Court held that "[t]here was a credible threat of violence here, and I find that the drug and prostitution activity alleged is a part of the offense conduct and it is inextricably intertwined." [*Id.*]. Additionally, the Court found that, for purposes of determining whether a prior offense resulted in criminal history points, the offense conduct dated back to at least September 2017. [*Id.* at 24–25]. This calculation was based on Thomas's distribution of heroin to Victim 3 and K.T. [*Id.*]. The Court rejected Thomas's argument that the offense conduct only occurred in 2018. [*Id.* at 23–25].

Thomas's Total Offense Level was 13, and his Criminal History Category was III. [*Id.* at 25]. This resulted in a Guideline range of 18 to 24 months imprisonment. [*Id.*]. The government argued for an upward variance and a sentence of 48 months imprisonment. [*Id.* at 26]. The Court

---

[3] Exhibit N is the transcript of Thomas's sentencing hearing. It is incorrectly dated October 25, 2018. The hearing was held on October 23. [*United States v. Thomas*, 4:18-cr-051-JAJ (S.D. Iowa), Dkt. 54 (Order Setting Hearing); 58 (Minutes); 60 (Judgment)].

agreed with the government's assessment of the seriousness of the offense. [*Id.* at 29]. The Court found that the Guidelines inadequately addressed the circumstances, and that the Guideline range was unreasonable. [*Id.* at 30]. Therefore, the Court sentenced Thomas to 48 months imprisonment. [*Id.*].

**6.      Post-sentencing Investigation**

On October 25, 2018, Officer Fong ran a search of DMPD records for information related to Thomas. [Def. Ex. B, Dkt. 30-3]. He ran this search because of his participation in K.T.'s proffer interview. [Gov. Br., Dkt. 36 at 10]. In that interview, K.T. had described Thomas's sex trafficking activity. [Def. Ex. M, Dkt. 30-14]. During his search of DMPD records, Fong found two reports: first, that Thomas had sexually assaulted Victim 4 in 2013; and second, that Thomas sexually assaulted K.S. in 2015. [Def. Ex. B., Dkt. 30-3]. Evidence was collected from both victims at the time of the reports and submitted to the DCI lab. [Def. Ex. O, Dkt. 30-16]. The DNA of semen found on the victims matched each other. [*Id.*]. Additionally, Victim 4 had identified Thomas as the man who assaulted her. [*Id.*].

Based on Victim 4's report and the matching DNA, Fong obtained a state search warrant for a buccal DNA swab from Thomas. [*Id.*]. In support of probable cause, Fong stated that DMPD opened a sex trafficking investigation into Thomas on February 27, 2017—the investigation related to Minor Victim A. [*Id.* at 3]. He also stated that the DMPD Vice/Narcotics section initiated a heroin trafficking investigation "concurrent" and "parallel" to the sex trafficking investigation. [*Id.* at 3–4]. The state court granted the warrant, and Officers Fong and Westlake collected Thomas's buccal swab the same day.

On October 30, 2018, Fong met with Victim 4 at the U.S. Attorney's Office. AUSAs Jennings and Bruner were present. [Def. Ex. B, Dkt. 30-3]. Victim 4 explained the details of her relationship with Thomas, beginning in 2009. [*Id.*]. During the interview, Victim 4 recommended that investigators contact Victim 2.  [*Id.*]. Victim 4 knew that Victim 2 was a heroin user and that Thomas had also trafficked her. [*Id.*]. Although Fong contacted Victim 2 in November 2018, he was not able to meet with her and she did not return his further efforts to reach her. [*Id.*].

On November 9, 2018, the DCI lab reported that the DNA from Thomas's buccal swab matched the DNA found on Victim 4 when she was assaulted in 2013 [Gov. Ex. 8, Dkt. 36-8 at 3], and the DNA found on K.S. when she was assaulted in 2015. [Gov. Ex. 9, Dkt. 36-9 at 3]. On

January 11, 2019, Thomas was charged by criminal complaint in state court with sexual assault-3rd degree for the assault on Victim 4. [Gov. Ex. 8, Dkt. 36-8 at 2]. He was charged with sexual assault-2nd degree for the assault on K.S. [Gov. Ex. 9, Dkt. 36-9 at 1].

On October 3, 2019, Thomas pled guilty to the pending state charges related to Minor Victim A, Victim 4, and K.S. [Gov. Ex. 5, Dkt. at 1]. Specifically, he pled guilty to one count of assault causing bodily injury for each Minor Victim A, Victim 4, and K.S. [*Id.*]. He was sentenced to serve three years imprisonment, one year for each count, the terms to run consecutively to each other but concurrently with his federal sentence. [*Id.* at 2].

In October 2019, DMPD Officer Carney tracked down and interviewed Victim 2. [Def. Ex. P, Dkt. 30-17]. Victim 2 described her experience being trafficked by Thomas. [*Id.*]. Victim 2 named one other woman (by first name only) who had been trafficked by Thomas. [*Id.*]. Carney eventually identified that woman as Victim 1.

In April 2018, Carney obtained three federal search warrants. On April 10, Carney obtained a federal search warrant for Thomas's Samsung Galaxy S8+. [Gov. Ex. 1, Dkt. 36-1, at 1]. At that time, the phone was in the possession of the DMPD because it had been seized in 2017, when Thomas was arrested on the state trafficking charges related to Minor Victim A. [*Id.* at ¶ 44; *see also* Def. Ex. D, Dkt. 30-5]. In support of probable cause, Carney described the information that Minor Victim A and Victim 3 had given in interviews and their grand jury testimony. [Gov. Ex. 1, Dkt. 36-1, at ¶¶ 8–41]. On April 24, 2020, Carney obtained warrants for Thomas's Samsung Galaxy Note 8 and Samsung Galaxy J1—the phones that had been seized when Thomas was arrested on February 28, 2018. [*United States v. Thomas*, 4:20-mj-201-CFB, Dkt. 2; 4:20-mj-202-CFB, Dkt. 3; *see also* Gov. Ex. 10, Dkt. 36-10]. Although DMPD had already received warrants for those devices related to the heroin case [*see* Def. Ex. I, Dkt. 30-10], Carney sought new warrants to investigate sex trafficking and prostitution charges. [Gov. Ex. 10, Dkt. 36-10, at ¶ 98]. In support of probable cause for these warrants, Carney recited substantially the same information received from Minor Victim A and Victim 3 that he had recited in his application for a warrant for Thomas's Galaxy S8+. [*Id.* at ¶¶ 9–43].

During spring and summer 2020, Carney continued to investigate Thomas and interviewed the other victims who would eventually be named in the indictment. He interviewed Victim 5 on April 3 [Def. Ex. R, Dkt. 30-19], Victim 6 on April 30 [Def. Ex. S, Dkt. 30-20], Victim 1 on June 18 [Def. Ex. Q, Dkt. 30-18] and Victim 7 on July 8 [Def. Ex. T, Dkt. 30-21]. In each of these

interviews, the women explained their relationship with Thomas and how he had trafficked them. Carney also re-interviewed B.B. on July 10. [Gov. Ex. 6, Dkt. 36-6]. During this interview B.B. told police for the first time that Thomas had trafficked her. [*Id.*; *see* Gov. Br., Dkt. 36 at 10].

7.      **2020 Indictment and Procedural History**

Thomas was indicted in the present case on July 15, 2020 {Dkt. 2]. A superseding indictment was filed on August 12, 2020. [Dkt. 9]. He was charged with sex trafficking, in violation of 18 U.S.C. §§ 1591(a)(1) and (b)(1) or (b)(2) (Counts 1, 2, 3, 8, 11, 12, 14, and 16); transportation for the purpose of prostitution, in violation of 18 U.S.C. § 2421(a) (Counts 4, 6, and 9); transportation for purpose of prostitution through coercion and enticement, in violation of 18 U.S.C. § 2422(a) (Counts 5, 7, and 10); distribution of a controlled substance to a person under age 21, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), and 859 (Counts 13 and 15); and use of a facility of interstate commerce to facilitate prostitution, in violation of 18 U.S.C. § 1952(a)(3)(A) (Count 17). [*Id.*].

Thomas filed a Motion to Dismiss on October 5, 2020. [Dkt. 30]. He alleges that the present charges violate Paragraph 3 of his 2018 plea agreement. [*Id.*]. The Court held a hearing on the motion on January 7, 2021. [Dkt. 49]. The following day, the government moved to dismiss Counts 13 and 15—the two controlled substance offenses. [Dkt. 50]. The Court granted the government's motion. [Dkt. 51].

LEGAL STANDARD

The courts "apply ordinary contract principles when construing plea agreements. Any ambiguities are construed against the government." *United States v. Zerba*, — F.3d —, 2020 WL 7509600 at *2 (8th Cir. Dec. 22, 2020) (citation omitted). Interpretation of these agreements is tempered by their constitutional implications—it is a violation of due process to allow the government to breach a promise that induced a guilty plea. *Margalli-Olvera v. INS*, 43 F.3d 345, 351 (8th Cir. 1994); *see also Santobello v. New York*, 404 U.S. 257, 262 (1971) ("[W]hen a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled.").

To ensure uniform federal interpretation of plea agreements, the federal courts apply federal common law. *United States v. Norris*, 486 F.3d 1045, 1054 (8th Cir. 2007) (en banc)

(Colloton, J., concurring). The courts look to the unambiguous terms of the plea agreement to determine the intent of the parties. *Margalli-Olvera*, 43 F.3d at 351. Specifically, "courts look to the reasonable beliefs of the defendant at the time a plea is entered to determine whether a plea agreement has been breached." *United States v. Olesen*, 920 F.2d 538, 541 n. 1 (8th Cir. 1990). The party asserting a breach of a plea agreement has the burden to show that a breach has occurred. *United States v. Raifsnider*, 663 F.3d 1004, 1009 (8th Cir. 2011).

<u>ANALYSIS</u>

As relevant to this case, Paragraph 3 states that the government will not charge Thomas for any offenses "arising from or directly relating to this investigation." [Plea Agreement ¶ 3]. The agreement includes three exceptions to this prohibition, but the parties agree that only the exception for crimes of violence is relevant to this case. Therefore, to determine if the charges in the present indictment are barred by the Plea Agreement, the Court must first decide the legal question of whether they are crimes of violence. If they are, they may be charged. If they are not crimes of violence, the Court then turns to the factual question of whether the charges arise from or directly relate to the investigation that lead to Thomas's 2018 heroin conviction.

**1.      Crime of Violence**

The starting point for interpreting a contract is the plain meaning of the terms. *See Margalli-Olvera*, 43 F.3d at 351. But when a contract uses "technical terms or words of art, . . . we afford these terms 'their technical meaning when used in a transaction within their technical field.'" *Hartford Fire Ins. Co. v. Clark*, 562 F.3d 943, 947 (8th Cir. 2009) (quoting Restatement (Second) of Contracts § 202(3)(b) (1981)). The practice of federal criminal law is a specialized field. Within this field, federal criminal litigants are familiar with the term "crime of violence" and the litigation that surrounds it. *See United States v. Barefoot*, 754 F.3d 226, 247 (4th Cir. 2014) ("When the Plea Agreement was executed in January 2003, federal criminal litigants would have been most readily familiar with the legal term "crime of violence" as set forth in the November 2002 edition of the Sentencing Guidelines."); *United States v. Carr*, No. 2:16-cr-00265-CMN-CWH, 2018 WL 10016170 (D. Nev. Sept. 21, 2018) (applying the categorical approach to interpret "crime of violence" in a plea agreement); *cf. United States v. Lara-Ruiz*, 681 F.3d 914, 920 n. 3 (8th Cir. 2012) (declining to apply the definition of "crime of violence" found in U.S.S.G.

§ 4B1.2(a) because "crime of violence" is a term of art that was not used in the plea agreement). Even if the litigant was not sure exactly which string of caselaw would govern the exact interpretation, they could expect that a court would apply the categorical approach. This approach creates certainty in the plea agreement—the parties can know, based on an indictment, whether charges are crimes of violence. The do not have to rely on a court's ad hoc assessment of whether the government has alleged violent facts before the evidence is submitted to a jury.

Because a plea agreement must be interpreted against the government, *Zerba*, — F.3d —, 2020 WL 7509600 at *2, the Court will apply the most narrow definition of "crime of violence" that the parties could reasonably have believed would apply when the agreement was signed. In federal criminal law, "crime of violence" has several possible definitions. *See* 18 U.S.C. §§ 16, 924(c)(3), and 3156(a)(4); USSG §4B1.2(a). What each of these definitions have in common is that each refers to "an offense that has as an element of the offense the use, attempted use, or threatened use of physical force against the person or property of another" (the "elements" or "force" clause). Several also refer to "any other offense that is a felony and that, by its nature involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense" (the "residual clause"). However, the Supreme Court has found that, in some circumstances, the residual clause is unconstitutionally vague. *See Sessions v. Demaya*, 138 S. Ct. 1204 (2018). Interpreting against the government and applying the most narrow definition that the parties could have understood at the time of the agreement, the Court will interpret the phrase "crime of violence" in the plea agreement to mean "an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another." Furthermore, the Court will apply the categorical approach to determine if the crimes charged in the Superseding Indictment are crimes of violence. *See Barefoot*, 754 F.3d at 247; *Carr*, 2018 WL 10016170 at *3.

None of the offenses alleged in the superseding indictment are crimes of violence under the categorical approach. First, sex trafficking by force, fraud, or coercion, in violation of 18 U.S.C. §§ 1591(a)(1) and (b)(1) is not a crime of violence. *United States v. Fuertes*, 805 F.3d 485, 498–99 (4th Cir. 2015). It may be committed through fraud, and, thus, committed nonviolently. *Id.* at 499. Similarly, a violation of 18 U.S.C. § 2422(a), transportation for purpose of prostitution by coercion or enticement, is not a crime of violence under the force clause because it can be committed through non-violent enticement. *See United States v. Keelan*, 788 F.3d 865, 870 n. 3

(11th Cir. 2015) (residual clause analysis overruled by *Johnson v. United States*, 576 U.S. 591 (2015)) (noting the government conceded that the force clause did not apply "because physical force is not an element of § 2422(b)"). Finally, neither transportation for the purpose of prostitution, in violation of 18 U.S.C. § 2421(a), nor use of a facility of interstate commerce to facilitate prostitution, in violation of 18 U.S.C. § 1952(a)(3)(A), are crimes of violence. Neither of these offenses requires any act of violence.

## 2. "Arising from or directly relating to this investigation"

Because these offenses are not crimes of violence, they do not fall within any exception identified by Paragraph 3 of Thomas's Plea Agreement. The government may only prosecute him for these offenses if they do not "arise from or directly relate to this investigation." To decide this issue, the Court will look at each victim individually and assess what steps the government took to learn of her involvement with Thomas. Based on these facts, the Court will determine if the charges arise from or directly relate to the heroin case such that a reasonable defendant in Thomas's position when he signed the Plea Agreement would have believed that it resolved those charges. *See Olesen*, 920 F.2d at 541 n. 1.

The Court finds that when the parties referred to "this investigation," that phrase meant the heroin investigation. The investigation was "a pretty standard drug case" resolved by a "fairly standard drug plea agreement." [Hrg. Trans., Dkt. 52 at 47]. That investigation consisted of three controlled buys and the search of Thomas's apartment. [*Id.* at 48]. Both the complaint and the indictment were limited to Title 21 controlled substances offenses, [*United States v. Thomas*, 4:18-cr-051, Dkt. 2, 23]. The factual basis for Thomas's plea of guilty was limited to facts related to drug trafficking. [Plea Agreement, ¶¶ 9(a)–(d)]. A reasonable person in Thomas's position at the time he signed the plea agreement would have believed that "this investigation" referred only to the information gathered by the government related to Thomas's drug trafficking.

### A. Victim 3

The Court will first consider Count 14, sex trafficking of Victim 3. As the government notes, "[o]f all the counts in the Superseding Indictment, there is the most factual overlap between the heroin investigation and the trafficking of Victim 3." [Gov. Br., Dkt. 36 at 22]. The government learned about Victim 3 because she was present when DMPD executed the search warrant on

Thomas's apartment on February 28, 2018. [Def. Ex. G, Dkt. 30-8]. Based on her presence at the apartment, the government conducted a follow-up interview with her on March 8, 2018. [Def. Ex. H, Dkt. 30-9]. That interview was conducted by Officer Wilshusen, the case agent for the heroin case. [*Id.*]. Also present were AUSAs Jennings and Bruner. [*Id.*].

The Court finds that Count 14, sex trafficking of Victim 3, directly relates the heroin investigation. The government identified Victim 3 because of the heroin investigation—they found her because she was present at Thomas's apartment when DMPD executed the federal search warrant. [Def. Ex. G, Dkt. 30-8]. Although the government is correct that Minor Victim A identified Victim 3, Minor Victim A identified her by the nickname "Puder." [Def. Ex. Y, Dkt. 42-4 at 18]. Minor Victim A's identification was not the factor that led the government to Victim 3's incriminating testimony. It was her presence.

The government argues that the charges related to Victim 3 do not "arise from or directly relate to" the heroin investigation because Thomas had already been charged for selling heroin when the government found her at his apartment. [Gov. Br., Dkt. 36 at 22]. That Thomas had already been charged by criminal complaint does not mean these charges are unrelated to the heroin case. The grand jury had not yet issued an indictment. When the indictment was eventually filed, it included more charges than the complaint and it reflected information learned from searching Thomas's apartment. [*United States v. Thomas*, 4:18-cr-051, Dkt. 2; Dkt. 23 at Counts 1, 5]. This indicates that the investigation was still ongoing when the government searched the apartment on February 28. Information gathered from the people and items found that day was related to the heroin investigation—otherwise, it would have been outside the scope of the warrant. Additionally, the government argues that the pending human trafficking charges are "fundamentally different" from distribution of heroin charges. [*Id.* at 23]. This is not controlling. The plea agreement was not limited to similar offenses or even Title 21 offenses—it applies to "any other federal criminal offense." [Plea Agreement ¶ 3].

Because Victim 3 was found at Thomas's apartment and interviewed by Officer Wilshusen, a reasonable person in Thomas's position would have believed that any possible charges related to her were closely intertwined with the heroin investigation. A reasonable defendant would believe that these charges would be covered by his plea agreement. Therefore, Count 14 must be dismissed.

### B.      Minor Victim A

The Court will next consider Count 12, the sex trafficking of Minor Victim A. Like Victim 3, Minor Victim A testified before the grand jury on March 27, 2018 and her testimony was introduced by the government at sentencing. [Def. Ex. Y, Dkt. 42-4]. However, the Court finds that this charge did not arise from or directly relate to the heroin investigation because the factual basis for Count 12 was publicly known before DMPD began investigating Thomas for trafficking heroin. Both the state and federal charges are based on the series of events in February 2017, after Minor Victim A had run away from her foster home. [*See* Def. Ex. C., Dkt. 30-4]. All the information necessary for this indictment was known to law enforcement in May 2017, when Thomas was charged in state court with trafficking Minor Victim A. [Gov. Ex. 2, Dkt. 36-2]. It is undisputed that the government knew about the allegations related to Minor Victim A while it was investigating Thomas for trafficking heroin. But mere awareness does not mean that the information arose from the investigation. The information was not based on events discovered or revealed by the government's investigation into Thomas's heroin trafficking.

Thomas argues that Count 12 must have arisen from or directly related to the heroin investigation because the government used the state charges in federal court proceedings. [Def. Br., Dkt. 30-1 at 28–29]. Specifically, the government argued at Thomas's detention hearing that he was a danger to the community because he trafficked heroin while on bond. [Def. Ex. J., Dkt. 30-11 at 8]. At sentencing, the government used Minor Victim A's testimony to argue for an upward variance. [Def. Ex. N, Dkt. 30-15 at 28].

The factors considered at a detention hearing or a sentencing hearing are independent of the factual basis for a guilty verdict. At a detention hearing, the Court considers the factors identified under 18 U.S.C. § 3142(g) to determine if there are any conditions of release that would reasonably assure the defendant's appearance and the safety of the community. 18 U.S.C. § 3142(g). These factors include, among others, a defendant's criminal history and whether he is on pretrial release at the time of the alleged offense. *Id.* Similarly, at sentencing, the Court considers the history and characteristics of the defendant and the need to protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a). Thus, at both proceedings, the Court considers factors beyond the facts and elements of the charge. A factor may be considered at a detention or sentencing hearing without arising from the charges in the indictment. In this case, the Court considered Thomas's pending state charges at these proceedings. Those charges were

based on facts that had been publicly known since 2017-- long before DMPD began investigating him for trafficking heroin.

Additionally, a reasonable defendant in Thomas's position could not have believed that his 2018 Plea Agreement resolved the sex trafficking charges related to Minor Victim A. First, the parties agree that AFPD Keiper did not negotiate for such a resolution, and AUSA Jennings never promised one. [Hrg. Trans., Dkt. 52, at 28–29, 37, 52]. Although Keiper hoped a guilty plea to the heroin charges would prevent the government from bringing federal human trafficking charges, this was far from certain. [*Id.* at 28–29]. Second, it is unreasonable to believe that human trafficking charges would be resolved by a 48-month sentence, or, as the defense argued at sentencing, a sentence below the 18 to 24-month Guideline range. [Def. Ex. N., Dkt. 30-15 at 25]. A violation of. § 1591(b)(2), as alleged in Count 12, carries a statutory minimum term of imprisonment of ten years. 18 U.S.C. § 1591(b)(2). Given the government's policy requiring a plea to the greatest charge, neither a reasonable defense attorney or an AUSA would expect to resolve a human trafficking charge by a sentence forty percent or less of the statutory mandatory minimum.

Because the facts that form the basis for the charge in Count 12 were known before the heroin investigation and a reasonable defendant could not believe that Thomas's plea would resolve the trafficking charges related to Minor Victim A, Count 12 does not arise from nor directly relate to the heroin investigation. This charge is not barred by the Plea Agreement.

### C.    Victim 4

Victim 4 is the only other victim in the indictment who had been identified by October 2018. She was identified when Officer Fong searched historical DMPD records for information related to Thomas. [Def. Ex. B., Dkt. 30-3]. Thomas argues that the charges relating to her are barred by the plea agreement because DMPD knew of them in 2013, when Victim 4 reported her assault. [Def. Br., Dkt. 30-1 at 29]. Thomas argues that in 2018, "DMPD resumed the investigation [of Victim 4's assault] as part of its parallel drug and sex trafficking investigations." [*Id.* at 29 n. 11].

The charges related to Victim 4 do not directly relate to or arise from the heroin investigation because the government did not learn of them during, or as a result of, the heroin investigation. The government did not learn of Victim 4 because of the heroin investigation. The

information arose from K.T.'s proffer interview. K.T. was interviewed because Fong and AUSA Bruner believed she might have information related to the Carter and Coleman sex trafficking case. [Gov. Br., Dkt. 36 at 9; Def. Ex. M, Dkt. 30-14]. K.T. identified Thomas at that interview. [Def. Ex. M, Dkt. 30-14]. Based on K.T.'s information, Fong searched for and found DMPD records for Thomas. [Gov. Br., Dkt. 36 at 9; Def. Ex. B, Dkt. 30-3]. And the government did not know about Victim 4 until after Thomas was sentenced. [*See* Def. Ex. B, Dkt. 30-3]. Thomas was sentenced on October 23, 2018. Officer Fong searched historical DMPD records on October 25. [*Id.*]. He interviewed Victim 4 at the U.S. Attorney's Office on October 30. [*Id.* at 2].

The government learned about the allegations related to Victim 4 after Thomas had been sentenced and long after he pled guilty. It learned this information because of the separate investigation related to Mark Carter and Darren Coleman, not because of the investigation into Thomas's heroin trafficking. A reasonable defendant in Thomas's position when he signed the plea agreement would not believe that it resolved allegations that would not come to light until after he was sentenced. Therefore, the charges related to Victim 4 do not arise from or directly relate to the 2018 heroin investigation. They are not barred by Thomas's Plea Agreement.

### D.      Victims 1, 2, 5, 6, and 7

The government identified the remaining victims after Thomas was sentenced. During her interview on October 30, 2018, Victim 4 suggested that the police find Victim 2 [Def. Ex. B, Dkt. 30-3 at 2]. Officer Carney eventually interviewed Victim 2 a year later, on October 30, 2019. [Def. Ex. P, Dkt. 30-17]. Victim 2 identified Victim 1, by first name only. [*Id.* at 1]. The record is not clear exactly how Carney identified Victims 5, 6, and 7, beyond the fact that he identified them in 2019 and 2020, and the identifications were, at least partially, aided by searches of Thomas's cell phones.

The charges relating to these victims do not arise from or directly relate to the heroin investigation. First, they did not "arise" until over a year after the heroin investigation concluded. Carney first learned of Victim 2's allegations in October 2019. He learned Victim 2 might have been a victim because of the information DMPD received from Victim 4 and because Carney tracked down Victim 2 a year after she stopped responding to Officer Fong. [*See* Def. Ex. B, Dkt. 30-3 at 2]. These charges are too attenuated from the February 2018 controlled buys and search of Thomas's apartment to say that they arise from or directly relate to that investigation. The same is

true for Victims 1, 5, 6, and 7, who were identified only through additional intervening investigation.

A reasonable person in Thomas's position in May 2018 could not have believed that his plea would resolve sex trafficking charges related to these five women. They were completely unknown to the government at that time, and remained unknown until, at the earliest, October 2019. They were not discovered because of information revealed by the heroin investigation. They were discovered because Officer Carney continued to investigate and to interview witnesses through mid-2020. [*See* Hrg. Trans., Dkt. 52, at 93–94]. The allegations arose from Carney's separate sex trafficking investigation. Therefore, they are not barred by the plea agreement. Because the charges specifically relating to these victims are not barred, the Travel Act violation alleged in Count 17, relating to much of the same conduct, is also not barred.

**3.      Remedy**

Because the Court has found, at least with respect to Count 14, that the government violated Thomas's plea agreement, it must determine what the appropriate remedy is for the breach. There are two possible remedies for the breach of a plea agreement: specific performance or withdrawal of the guilty plea. *Margalli-Olvera*, 43 F.3d at 354–55 (citing *United States v. Walker*, 927 F.2d 389, 391 (8th Cir. 1991)). Of these options, specific performance is the preferred remedy. *Id.* at 355. "In determining whether to grant specific performance, the court should consider (1) the possible prejudice to the defendant, (2) the conduct of the government, and (3) the public interest." *Id.* Prejudice to the defendant is the most important factor. *Id.* Additionally, the defendant may be given the choice of which remedy he prefers. *United States v. Goings*, 200, F.3d 539, 544 (8th Cir. 2000).

Thomas argues that the appropriate remedy in this case is specific performance. [Def. Br., Dkt. 30-1 at 33–34]. Specific performance, in this context, means the dismissal of Count 14, the count that was brought in violation of the plea agreement. In contrast, the government argues that the appropriate remedy is withdrawal of Thomas's guilty plea. [Gov. Br., Dkt. 36 at 28–30].

Regarding the first factor, the Court finds there has been prejudice to Thomas. Thomas relied on the government's promise not to pursue further charges in promptly pleading guilty and waiving his right to a jury trial. *Margalli-Olvera*, 43 F.3d at 355. Prejudice is also shown because Thomas has served most of his federal sentence. [*See* Def. Reply Br., Dkt. 42 at 21]. Once a

defendant has served a significant portion of his sentence, permitting him to withdraw his previous plea becomes an "empty remedy." *Lara-Ruiz*, 681 F.3d at 923. The second factor, government conduct, also weighs in favor of dismissal because only the government has failed to perform a promise it made in the plea agreement. *Margalli-Olvera*, 43 F.3d at 355. Finally, as to the third factor, the public has an interest in the finality of convictions and the predictability of plea agreements. This interest would be hampered if the government was permitted to withdraw from a plea agreement years after a conviction has become final, and the parties were required to re-litigate the case. Thomas's conviction became final over two years ago. The public interest weighs against withdrawing his guilty plea. The final factor thus weighs in favor of specific performance.

All three of the relevant factors weigh in favor of specific performance. This is also the remedy that Thomas as requested. The Court finds that the appropriate remedy for the government's breach of Thomas's 2018 plea agreement is dismissal of the offending charge—Count 14. Therefore, Count 14 will be dismissed.

<u>CONCLUSION</u>

For the foregoing reasons, the Court finds that Count 14, the sex trafficking of Victim 3, arose from the government's 2018 heroin investigation. That count, therefore, must be dismissed. All other counts remain. The Court notes that this order in no way affects what evidence will be admissible at trial or otherwise restricts the government's ability to introduce facts related to the trafficking of Victim 3.

Upon the forgoing,

**IT IS ORDERED** that defendant's October 5, 2020 Motion to Dismiss [Dkt. 30] is **GRANTED in part and DENIED in part**.

**IT IS FURHTER ORDERED** that Count 14 is **DISMISSED** with prejudice.

**DATED** this 2nd day of February, 2021.

JOHN A. JARVEY, Chief Judge
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA